UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

------------------------------------------------------------

FARRAH MARQUETTE,         )

                             )

              Plaintiff,    )  Case No. CV 18-1719

                             )  Green Bay, Wisconsin

     vs.                    )

                             )  August 14, 2019

OSHKOSH DEFENSE, LLC,     )  10:00 a.m.

                             )

             Defendant.    )

------------------------------------------------------------

**TRANSCRIPT OF ORAL ARGUMENT RE:**
**MOTION FOR CONDITIONAL CLASS CERTIFICATION**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        Hawks Quindel SC
                        By: LARRY A. JOHNSON
                            SUMMER H. MURSHID
                            TIMOTHY P. MAYNARD
                        222 E Erie St - Ste 210
                        Milwaukee, WI 53201-0442
                        Ph: 414-271-8650
                        Fax: 414-271-8442
                        lljohnson@hq-law.com
                        smurshid@hq-law.com
                        tmaynard@hq-law.com


For the Defendant:        Godfrey & Kahn SC
                        By: JOHN A. HAASE
                            ANNIE LAURIE EIDEN
                        200 S Washington St - Ste 100
                        Green Bay, WI 54307-3067
                        Ph: 920-432-9300
                        Fax: 920-436-7988
                        jhaase@gklaw.com
                        aeiden@gklaw.com


Also Present:           Graeme Rattray, In-House Counsel

U.S. Official Transcriber:  JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:        WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



1

1              TRANSCRIPT OF PROCEEDINGS

2          Transcribed From Audio Recording

3                  *     *     *

4          THE COURT:  Be seated.

5          THE CLERK:  The Court calls Case No. 18-CV-1719,

6   *Farrah Marquette vs. Oshkosh Defense LLC*, for an oral argument.

7          May I have the appearances, please?

8          MR. MAYNARD:  Good morning, Your Honor.  Timothy

9   Maynard, Summer Murshid and Larry Johnson of Hawks Quindel on

10  behalf of the plaintiffs.

11         THE COURT:  Good morning.

12         MR. HAASE:  Your Honor, John Haase, Annie Eiden,

13  Godfrey & Kahn, along with Graeme Rattray who is in-house

14  counsel at Oshkosh Defense, on behalf of the defendant.

15         THE COURT:  Good morning.

16         MS. EIDEN:  Good morning.

17         THE COURT:  Okay.  I think you asked to put this on

18  for argument.  I'm not sure if that was because you thought you

19  would get a faster decision or there were unique aspects of the

20  case, but let's go.

21         MR. MAYNARD:  Sure.  Thank you, Your Honor.

22         THE COURT:  Mr. Maynard.

23         MR. MAYNARD:  So we are here today to discuss

24  plaintiff's pending motion for conditional certification of an

25  FLSA collective action.

1    Plaintiff has alleged that the defendant has common

2   policies and practices that potentially violate the FLSA on

3   behalf of, not just herself, but all other hourly production and

4   maintenance employees that have worked for the defendants since

5   October of 2015.

6    We would submit, Your Honor, that the plaintiffs have

7   met their burden in this case. Their burden is to show that

8   there are common policies and practices that apply to the

9   collective -- putative collective class that could have violated

10   the FLSA. That is what we have here and that is what the

11   evidence supports.

12    Every single person in the collective class is subject

13   to a practice where they are allowed to come into work up to a

14   half hour before the start of the scheduled shift and to stay at

15   work up to 15 minutes after the end of their scheduled shift.

16    Despite the defendant's arguments otherwise, if you

17   review the available policies and collective bargaining

18   agreement, there is no prohibition anywhere on work occurring

19   during that time. And if you review the testimony of the

20   defendant 30(b)(6) designees, you'll see that defendant does not

21   actually prohibit any work from occurring from that time. And

22   they also don't track what's occurring during that time by these

23   plaintiffs in the putative class.

24    The CBA only states that the employees are obligated

25   to work their assigned hours. It doesn't say that they could

1  only work their assigned hours.  It doesn't say that nothing can

2  be done in the 30-minute period or the 15-minute period.

3         And if you look at the policies and procedures and

4  training modules that have been produced by defendants to date,

5  there is nothing that really discusses the 30- and 15-minute

6  periods in any sort of substantive manner this terms of

7  instructing employees on what to do during that time.

8         The closest we have is a training module on the Kronos

9  timekeeping procedure that says this is -- you know, you're

10  allowed to punch in up to 30 minutes early and you're allowed to

11  punch out up to 15 minutes late.  And also, by the way, you

12  should be punched onto a nonproductive labor code or a work

13  order within three minutes of being punched in.

14         There is no explicit if you're punched in during a

15  30-minute period you should not be working, you should not be at

16  your workstation, you should not be getting any workstation

17  prepared so that you're ready to go at the start of your shift.

18         Similar at the end of the day.  There's nothing that

19  explains, you know, once the bell rings at the end of the day

20  you must drop everything and leave your shift.

21         And that is -- that's the issue here.  The defendants

22  have gone through great lengths to try and analogize this case

23  to this Court's decision in *Tom v. Generac*, which was a case

24  also about pre-shift work being performed, and they've

25  essentially tried to retrofit the facts of the case to the

4

1    Court's analysis in that case.

2            Unfortunately the facts don't fit here.  And the most

3    important thing -- takeaway from the *Generac* case was that there

4    was an explicit prohibition from the employees that they were

5    not allowed to work outside of their scheduled hours without

6    supervisor approval.

7            There was then another explicit policy that said if

8    you work during that time you are expected to tell your

9    supervisor about it and make sure you are paid for it and we'll

10   pay you for that time, but we'll also discipline you for working

11   without approval.

12           None of those things exist here.  Essentially what the

13   defendants have is a practice that treats these 30-minute

14   windows at the start of the day and 15-minute windows at the end

15   of the day in a vacuum that's disconnected from the rest of the

16   day.  And it's really those particular time periods that are at

17   issue here.

18           The defendants have tried to say, well, you can look

19   at the plaintiff's payroll records and see that we don't always

20   pay them to their scheduled hours, we'll adjust time.  Sure, but

21   if you look at the actual instances where they were adjusting

22   time, they're adjusting when work occurs outside of the

23   30-minute window.  So if someone punches in 35 minutes early

24   they'll get paid, but if they punched in at 30 minutes early

25   they don't get paid.  If they punch out 20 minutes late they'll

1    get paid, if they punch out 14 minutes late they won't get paid.

2           There is no logical reason to distinguish between

3    those periods of time of what is compensable and what should be

4    adjusted, absent the clear prohibition on work occurring in

5    these periods.

6           The defendants have tried -- have spilled a lot of ink

7    about whether or not this is a grace period versus a rounding

8    policy.  Frankly at this point in time it doesn't matter,

9    Your Honor.  Call it a grace period, call it a rounding policy.

10   The reality is this:  If the work is being performed in the 30

11   minutes pre shift and the 15 minutes post shift, then it has to

12   be paid.  There is no -- there is no exemption or no

13   qualification under the FLSA that would say calling something a

14   grace period means that you can accept free work during that

15   period.

16          That is the issue here.  If you look -- you know,

17   they've talked about auditing their Kronos records, and they've

18   done so in a way that's sort of misleading because they say,

19   yeah, we do audits.  Well, they audit what occurs during the

20   shift, they audit what occurs outside of the 30- and 15-minute

21   period, but they've testified, their 30(b)(6) designee has

22   testified they do not audit what occurs in the 30-minute and

23   15-minute period despite having instructions that say that you

24   need to be punched onto a nonproductive labor code or work order

25   within three minutes of punching in.

6

1       You know, that failure to have any oversight over

2  what's occurring here is a class-wide practice and issue that

3  affects everyone and could lead to a violation of the FLSA.

4       Absent a prohibition on this work occurring, or a

5  prohibition on this occurring during this time, there is no

6  reason to believe that every single person in that collective

7  class who was allowed to show up to work during these pre-shift

8  and post-shift periods is not performing work.

9       And there are other, you know, arguments that

10  defendants make, Your Honor, that frankly don't really get to

11  the nuts and bolts of this matter.

12       You know, they argue that the average punch times

13  between people are too varied.  Frankly, the average punch times

14  don't matter.  You're looking at overtime accrues under the FLSA

15  on a workweek-by-workweek basis.

16       If someone for three months punched in every day 15

17  minutes early and then for the rest of the statutory period

18  never punched in early, they would still have claims in those

19  three months.  So the average punch times don't really mean

20  anything.

21       We've talked about their adjustments to the pay

22  records don't really show -- they don't mean anything unless

23  they're able to show, yes, here's the times when we've made

24  actual adjustments in the periods that are at issue.

25       THE COURT:  Are you saying that everybody who punched

1    in early was working?

2            MR. MAYNARD:  I'm not saying necessarily that everyone

3    who punched in early was working, but everyone could have been

4    working based on the --

5            THE COURT:  Does the fact that they could have been

6    working entitle them to overtime?

7            MR. MAYNARD:  No.  That's not what we're saying,

8    Your Honor.

9            THE COURT:  So you would have to show -- you would

10   have to establish as to each member -- class member that they

11   were working during the grace period or whatever you want to --

12           MR. MAYNARD:  Eventually, Your Honor.  Not at

13   conditional certification.  We just need to show --

14           THE COURT:  Right.

15           MR. MAYNARD:  -- why it -- why this is potentially an

16   issue for everyone right now.

17           THE COURT:  Yeah.

18           MR. MAYNARD:  And if notice goes out we might be able

19   to figure out more specifically, once everyone is notified that

20   there's a potential issue here, where this is happening, how

21   often it's occurring.

22           THE COURT:  Doesn't that make it an individualized

23   determination as to each employee in the pay period?  And you

24   have people with many different supervisors who may or may not

25   have known if some work was being done?  Aren't you into that

1    individualized determination?

2            MR. MAYNARD:  It could be down the road, Your Honor.

3    But at this point at conditional certification, it shouldn't be

4    individualized because we don't even know how often it's

5    working.

6            We might find out when notice goes out and people have

7    an opportunity to join that, okay, it's happening on this line

8    and this line and this line and there's actually separate

9    subclasses within the broader collective right now.

10           So while potentially it could be individualized, it's

11   premature at this point in time to say that it's individualized

12   and notice shouldn't go out because the practice is the same for

13   everyone and there is no prohibition on the work occurring

14   during that time.

15           THE COURT:  Okay.  Mr. Haase, or your side?

16           MR. HAASE:  Thank you, Your Honor.

17           The first thing that struck me in hearing opposing

18   counsel's comments were that in the initial complaint filed in

19   this action, plaintiff alleged an illegal rounding practice.

20           In the amended complaint that was filed on the same

21   day this motion was filed, alleged an illegal rounding practice.

22   Opposing counsel's initial brief alleged an illegal rounding

23   practice.  And today we hear opposing counsel say it doesn't

24   matter if we have an illegal rounding practice.

25           And the reason for the change and the shift in

1  strategy is that opposing counsel realizes Oshkosh Defense does

2  not have an illegal rounding practice at all.  And as you point

3  out, Your Honor, what they're really alleging in this case is

4  that some employees may be violating the prohibition on

5  pre-shift work.

6          THE COURT:  Where does the -- where is the

7  prohibition?  That seems to be real distinction that's drawn

8  between this and *Generac*.  Where is the prohibition?  It's not

9  in writing but it's -- where?  Where is it?

10         MR. HAASE:  Your Honor, in this case, unlike *Generac*

11 where there were policies that the employer could unilaterally

12 revoke at any time, the employees that are in the putative class

13 here are all members of a collective bargaining unit.  For years

14 they've been represented by the United Autoworkers.  So the

15 employees in this class have a designated bargaining

16 representative for purposes of wages, hours and conditions of

17 employment.

18         Through the collective bargaining process, the parties

19 had come to a written collective bargaining agreement which sets

20 forth several rules in writing which not only the company is

21 obligated to follow, but so are all those employees.  And these

22 rules make it abundantly clear that employees can't decide to

23 work when they want to work.

24         THE COURT:  Unions don't like their members working

25 for free, do they?

1    MR. HAASE:  Absolutely not, Your Honor.  And one of

2  the declarations we submitted from the -- from one of the

3  leaders who works at the Oakwood facility where they essentially

4  are testing trucks for final delivery, there they start at 4 in

5  the morning.  And he said, "My problem is getting people up and

6  started and working when the shift time starts."

7    I want to talk a little bit about what they're

8  actually proposing in this case in terms of a class, Your Honor.

9  It's a huge class — over 3,000 current and/or former employees

10  of Oshkosh Defense.  These individuals work at either one or

11  more of eight different facilities at the company, in either one

12  or more of 70 very different job classifications where employees

13  perform very different duties.

14    I thought we were going to be talking about a rounding

15  policy today, but apparently not.  Clearly Oshkosh doesn't have

16  a rounding policy.  What it does, Your Honor, through the

17  collective bargaining agreement, is it schedules employees to

18  work, it tells them to work those hours, and it pays them for

19  those hours.

20    So now you asked where is the prohibition in working

21  outside of their shift.  First, Your Honor, under the collective

22  bargaining agreement employees have a standard eight-hour work

23  day.  They have standard shifts established by the collective

24  bargaining agreement.  Except for overtime hours, if the shift

25  hours are changed the employees need to agree to it.

11

1    The collective bargaining agreement addresses when

2  employees get overtime.  As you know, relevant to this case the

3  Fair Labor Standards Act requires employers to do one thing —

4  that's pay time-and-a-half the regular rate for hours worked

5  over a 40 in a workweek.

6    Oshkosh Corporation has agreed in writing in the

7  collective bargaining agreement that's given to every employee,

8  that you get time-and-a-half your regular rate for any work done

9  over eight hours in a work day and for any work done on a

10 Saturday.  If an employee works more than 10 hours in a day,

11 they get double-time.  And if they work on Sundays, they get

12 double-time.

13    In 2018 alone, Oshkosh Defense paid current employees

14 in the putative class $5.6 million in overtime pay.  This is not

15 a company that's trying to shirk its obligations to pay

16 employees overtime.

17    Now, an important thing to keep in mind is employees

18 get a copy of the collective bargaining agreement, unions know

19 what's in the collective bargaining agreement and they take very

20 seriously their overtime -- their right to overtime.  If

21 employees -- if employees were working over eight hours a day,

22 which is the allegation in this case, clearly the company would

23 have heard about it at some point.  It didn't.

24    Under the collective bargaining agreement there is a

25 grievance procedure, Your Honor, where an employer or a union

12

1    can file a grievance --

2              THE COURT:  But I think the point that plaintiffs are

3    arguing isn't that these employees were ordered to do it, but

4    they did do it.  It was just they got there early and they were

5    ambitious employees or they wanted to set up and they found it

6    better to begin work earlier than to try to get everything going

7    when the whistle blows whenever.  And that under the Fair Labor

8    Standards Act, the company has an obligation to either prevent

9    them from doing that -- or if it sees them doing that to stop --

10   you know, pay them.  It can't acquiesce, as I understand the

11   Fair Labor Standards Act, even if it's not -- if they're not

12   claiming wages, the company is not allowed to take advantage of

13   overambitious employees which there are -- I'm sure there are

14   some.

15             MR. HAASE:  Your Honor, I don't disagree with that

16   statement.  But relevant to that, first, the company does take

17   action to police these pre- and post-shift times.  It has its

18   team coordinators on a production floor during these periods of

19   time.  We've submitted multiple --

20             THE COURT:  Plaintiffs allege that they're not looking

21   at what people do, though.  They're looking at other violations.

22             MR. HAASE:  That's not true, Your Honor.  The

23   declarations we've submitted from multiple team coordinators all

24   say they are looking at what employees are doing, and in their

25   observations the employees are not working.  They're sitting in

13

1   chairs with air-buds in listening to music, they're getting

2   coffee, they're sitting in the break room, they're socializing

3   with coworkers.

4        So we've provided substantial evidence that team

5   coordinators, supervisors are on the floor.  One of their jobs

6   is to monitor what employees are doing, and in their

7   observations employees are not working.

8        THE COURT:  We're at the initial certification stage

9   which doesn't require a determination on the merits.  But it's

10  kind of that determination that if there is a case here then it

11  makes sense to allow a collective action.

12       Why not acquiesce -- why not go along, okay, we'll

13  give notice, we'll clear all this out right away?  What are the

14  costs to the company to notice?  Why do you fight notice before

15  you get to the merits?

16       MR. HAASE:  Your Honor, as has been articulated in a

17  number of cases dealing with the standard of review, the

18  issuance of the notice in this case is going to go to over 3,000

19  people.  That could potentially result in hundreds or even

20  thousands of employees opting in.

21       The first thing that will happen if there are any more

22  opt-ins, is opposing counsel is going to ask us to produce all

23  of their payroll and pay records.  From there, additional

24  depositions and discovery burdens will fall on the company, in

25  addition to additional analysis.

14

1      And the cases that have focused on those factors and

2  the burdens to the defendant have held, as you indicated,

3  Your Honor, if these are individualized evaluations of potential

4  liability, and if it's clear at the conditional certification

5  stage that certification is not appropriate, then you shouldn't

6  issue conditional certification.

7          THE COURT:  Uh-huh.

8          MR. HAASE:  Your Honor, in thinking about that issue,

9  though, I also go back to what Judge Scalia wrote in the

10  *Hoffmann-La Roache* case back in the late 1980s which authorized

11  the conditional certification process, and he can say it better

12  than I can and I'll quote his words in a minute.  But what's

13  important about it is it illustrates that conditional security

14  isn't -- conditional certification is not a minor thing and

15  shouldn't be lightly undertaken in any circumstance.  This is

16  what Judge Scalia said.

17      A request by a plaintiff asking the court to

18  conditionally certify a class is "a request to use its

19  compulsory process to assist the plaintiff in locating

20  nonparties who may have similar claims and obtain their consent

21  to the plaintiff's prosecution of those claims."

22      In other words, what the request is, is to get an

23  assist from the court to notify non-litigants of their right to

24  join a case where they could be litigants.

25      The Fair Labor Standards Act once had a provision that

1    allowed for Rule 23 classification.  That was removed by the

2    Portal-to-Portal Act and class certification is no longer

3    appropriate.

4         The structure of the statute is that employees have to

5    affirmatively opt in.  Now, I agree that district courts can

6    exercise their discretion where they feel it's appropriate to

7    grant conditional certification.  But the point is what the

8    court is doing is really helping one party to this litigation at

9    the expense or potential expense of another party when

10   conditional certification is issued.

11        Your Honor, I want to get back to this argument that

12   the company doesn't have any policy that prohibits employees

13   from working outside their shift.  That is not correct.  The

14   collective bargaining agreement that has been negotiated with

15   the employees' authorized bargaining representative at Article 7

16   says this explicitly:

17        "It is the obligation of employees to work as

18   scheduled on the work assigned by the company.  An employee who

19   decides to work outside their scheduled shift is not working as

20   scheduled and they are violating that provision of the

21   contract."

22        Your Honor, the plaintiffs are focused on whether or

23   not the company technically used words that are clear enough to

24   them to understand that pre- and post-shift work was not

25   authorized.

16

1     But the proof is in the pudding in this case,

2 Your Honor.  The employees themselves knowledge that the

3 collective bargaining agreement prohibits pre- and post-shift

4 work.  We've submitted seven declarations from putative class

5 members where they all acknowledge the rule and understand the

6 rule and know the purpose of the rule.

7     Not only that, we've had the opportunity to depose

8 just three of the current plaintiffs.  Each and every one of

9 them, including the lead plaintiff, admitted that the collective

10 bargaining agreement prohibits them from working outside of

11 their shifts.

12     Now, Ms. Marquette has filed a declaration in this

13 action where she says, "I didn't know I was prohibited from

14 working outside of my shift during the 30- and 15-minute

15 windows."  But, Your Honor, that testimony is directly

16 contradicted from what's in her deposition on multiple pages of

17 the deposition transcript.

18     With respect to the issue of grievances, Your Honor,

19 as I said, what these plaintiffs are -- what the plaintiff is

20 alleging here is that she's working outside her shift more than

21 eight hours a day and not getting overtime for it.  The

22 collective bargaining agreement prohibits her from working

23 outside of her shift.  And it also says if she works more than

24 eight hours in a day she needs to get paid time and a half.  If

25 there was some significant issue of the type alleged by

1  Ms. Marquette in this case, the company would have gotten a
2  grievance that it wasn't paying employees overtime.

3  Since 2009, the union here has filed 6,000 grievances.
4  40 percent of them relate to employees' pay.  Were not getting
5  overtime when they felt they should get overtime.  Not a single
6  one of those grievances has ever alleged that employees are
7  being asked -- that employees are working outside their
8  regularly scheduled shifts and not getting paid for it.  That
9  issue has never come up.

10  In fact, the plaintiffs who are in this case now have
11  filed 38 grievances against the company.  None of them has ever
12  alleged that they're working outside their shifts and not
13  getting compensated.

14  Your Honor, another important fact which opposing
15  counsel ignores, is Oshkosh Defense has no policy or practice
16  that requires the employees to even arrive to work or punch in
17  before the start of their shift.

18  In the collective bargaining agreement there's an
19  attendance policy.  Under the attendance policy it's a violation
20  if employees are late.  The definition of being late or tardy,
21  however, Your Honor, is an employee punching in after the start
22  of their shift.  Marquette admitted she understands that rule,
23  and that she can punch in right when she enters the facility
24  even if she's not at her workstation working.  And so long as
25  it's not after the start of her shift, she's on time and getting

18

1  paid for her shift hours.  All of the other opt-ins who we

2  deposed also understand that rule.

3          With respect to the 30- and 15-minute windows,

4  Your Honor, those are grace periods for the benefit of the

5  employees and their convenience.

6          Think about some of the facilities at issue in this

7  case.  One is South Plant.  This is an assembly facility for

8  Oshkosh Defense.  Just on the second shift alone there's 750

9  employees and the facility is 350,000 square feet.  Without some

10 window at the front end of the shift for people to arrive, it

11 would be chaotic.  People all can't arrive and punch in at the

12 same time.  This flexibility benefits the employees.

13         One of the opt-in employees who we deposed, Mr. Vue,

14 talked about that he understood these grace periods to allow

15 people commuting flexibility.  He lives a long way from the

16 plant.  So to deal with potential traffic jams or weather

17 issues, he leaves a little bit earlier than his normal traffic

18 time would allow.  The grace period allows him to come into the

19 facility before his shift starts and sit down, have a cup of

20 coffee, shoot the breeze with his coworkers.  He even testified

21 that the reason he gets there early is to get a good parking

22 space.

23         Other declarations we submitted from potential class

24 members also acknowledge that the grace periods are there for

25 their benefit and convenience.

19

1    Your Honor, another important fact that was also

2  present in the *Generac* case is that not only does the company

3  prohibit work outside the shifts, but when employees arrive

4  Oshkosh Defense signals the start of the workday by either a

5  buzzer or a bell.  So employees are put on notice when it's time

6  to start working.  The declarations we've submitted from

7  potential class members all acknowledge their understanding that

8  the start-of-shift bell means you start working.  Even

9  Ms. Marquette admitted that during her deposition.

10    Your Honor, at the end of the shift it's the same

11  thing.  Oshkosh Defense sounds a bell, employees know it's time

12  to stop working.

13    The testimony that we've submitted in this regard is

14  compelling.  Marquette said that everyone in the plant knows

15  that when the end-of-shift bell sounds it's time to stop

16  working.  That's the lead plaintiff's testimony, yet she's

17  alleging there's a class practice where employees are working

18  after their shift based on some common policy.

19    She also described the end of shift as a mass exodus.

20  Other employees described it as a stampede, a mad dash.

21  95 percent of the employees are lined up at the Kronos clocks at

22  the end of the shift to punch out.

23    The time records of the plaintiffs, Your Honor,

24  support that there is nothing -- no work being done at the end

25  of the shift.  27 of the 30 plaintiffs in this case on average

1    punch out less than one minute after the end of their shift.

2    The other three average just over a minute, just over a minute

3    and a half in three minutes.

4         Your Honor, these facts make it clear that Oshkosh

5    Corporation tells employees and agrees with employees when their

6    shift hours are, it pays them to those shifts, it prohibits work

7    outside of the shift, and it polices whether employees are doing

8    work outside of their shift.

9         Another important factor on this policing issue.  As

10   opposing counsel points out, the company doesn't do specific

11   Kronos auditing of an employee's punches during the 30- or

12   15-minute windows, but it does all sorts of audits on employees'

13   Kronos punching into the time clock.

14        And what this means is that employees and their

15   supervisors are constantly interacting about their pay records

16   and their time records.  In fact, we have submitted evidence

17   that all of the plaintiffs in this case on multiple occasions

18   have asked -- have had their schedules adjusted, including

19   within the grace periods, to account for work that was

20   performed.

21        This happens when a team coordinator asks someone to

22   stay late or come in early.  It could happen where an employee

23   got started early and was seen doing it.  But the company

24   polices this issue.  And we've even submitted evidence from the

25   HR employees at the company that when it becomes aware of

21

1  employees working outside of their shift, it deals with it first

2  with a verbal warning and then more formal discipline

3  thereafter.  So the company does police this issue, Your Honor.

4         The bottom line here, Your Honor, is that the claims

5  in this case do not allege that there's a common policy -- or

6  the facts in this case do not prove that there's a common policy

7  applicable to the class which deprives them of any rights under

8  the FLSA.  There's no evidence of that.

9         What is really going on is you have a series of

10  individualized claims that some employees have taken upon

11  themselves to violate the rules, work before their shifts, and

12  now they're seeking compensation.

13         But to get to the bottom of each plaintiff's claims is

14  an individual test.  We would need to find out:  What work is

15  this employee claiming that they perform?  What is their job?

16  How does that alleged work relate to their job, if at all?  How

17  long are they doing it?  Is it de minimis?  Are they claiming

18  that they weren't aware of the rule prohibiting work outside

19  their shift?  Is that a credible claim?

20         It would involve questions about our other defenses as

21  well, Your Honor.  All of these issues require individualized

22  determinations which are not susceptible to class litigation,

23  Your Honor.

24         Consider just the nature of the work involved in the

25  70 different classifications.  These include janitors, welders,

1    final truck testers, truck drivers.  None of these employees do

2    work that's even remotely similar.  They work in eight different

3    manufacturing facilities that have different purposes.  One

4    manufacturing facility is for assembly, another is for paint.

5    One is for welding and fabrication.  There is one where trucks

6    are tested.  There is one where they're stored for delivery.

7    These are vastly different operations that they're trying to

8    include in the proposed class.

9         If you looked just at the three plaintiffs that we've

10   been able to depose, the fact that these are individualized

11   claims is really clear.  Ms. Marquette is a fabricator.  She

12   works on a machine that bends parts.

13        She's also -- works on a shift that has three

14   eight-hour shifts scheduled each day.  So just consider that for

15   a minute, Your Honor.  Someone is working on the machine she

16   works at for the eight hours before she starts and someone

17   starts after her eight-hour shift is done.  Just given that, her

18   claim that she's doing pre-shift work is illogical.  But she

19   claims that her pre-shift work is organizing parts, turning on

20   her press brake.

21        Scott Vue, on the other hand, claims that he's

22   gathered parts and sets up his workstation.

23        Marquette on average punches into the facility only

24   two minutes before the start of her shift and punches out 45

25   seconds after the end.

1          Mr. Vue punches in, on average, four minutes before

2     the start of his shift and only 20 seconds after it ends.

3          Marquette claims that she was working the entire time

4     after she punched into the facility, which again is not a

5     credible allegation, Your Honor.  She admitted that it takes her

6     a couple of minutes from when she punches in when she enters the

7     facility to get to a workstation.  On average she only punches

8     in two minutes before the start of her shift.  How can she be

9     performing work during that whole two-minute time?

10          Mr. Vue claims that he starts working before he even

11     punches in during the grace periods.  So his claim isn't even

12     consistent with the allegation that somehow these punching

13     windows are resulting in employees working before the start of

14     their shifts.

15          Each and every plaintiff who decides to enter this

16     case, their claim will be determined based on individual

17     determination of a myriad of factors which are not common in any

18     way to the class.  And that they won't vary just from employee

19     to employee, but they'll also vary based on a single employee

20     depending on his or her position on a particular time, what they

21     were doing on a particular day, what shift they worked, who was

22     their team coordinator, and what were their personal motivations

23     for coming in early and allegedly starting work early.

24          Your Honor, given these facts, it's clear that these

25     claims are not susceptible to class litigation and the class

1 should not be certified.  We'd ask you to deny the request.

2           MR. MAYNARD:  Thank you, Your Honor.  I'll try and

3 address everything that defense counsel's argued here.

4           First, he stated that he came here to argue about an

5 alleged rounding practice.  Again, whether you want to call it a

6 grace period or a rounding practice at this point in time is a

7 difference without distinction.  The reality is this:  If

8 employees were punching in 10 minutes before their shift and

9 starting to work and they were not getting paid until the start

10 of their shift, that's effectively a rounding practice.

11           The same thing at the end of the day.  If they're

12 punching out 10 minutes after the end of their shift because

13 they continued working and they only get paid until the end of

14 the shift, that's a rounding practice.  They're rounding the

15 start and end of their times only in the employer's favor.  So

16 to say that we've changed our theory at this point in time is

17 simply misstating what the reality of this case is and how it

18 works.

19           They -- defense counsel's argued that there's no

20 policy that requires employees to come into work early.  But the

21 FLSA does not only require employers to pay for time that is

22 worked that is required, they have to pay for all work that is

23 suffered or permitted to be done.

24           And that's what we have here failing a clear

25 prohibition.  That is a class-wide question for everyone in the

25

1    collective action.  You are all allowed to come in early, you're

2    all allowed to punch in, and they do not -- the evidence shows

3    they do not monitor what's occurring during this time.

4        They have one -- they have brought a group of team

5    coordinators who say, yeah, people aren't working during this

6    time.  All of the plaintiffs, 14 plaintiffs who have testified

7    and provided declarations in support of the motion, have said

8    no, I am working and my team coordinators do see me working and

9    they're not insuring that we're being paid for it.

10       So there is a factual dispute there.  But even worse

11   is, in undercutting their argument that there's a clear

12   prohibition, team coordinator Steven Peronto has submitted a

13   declaration in support of defendant's opposition, acknowledged

14   that he supervised one of the opt-in plaintiffs, David Sunquist.

15   And he acknowledges, he says David Sunquist doesn't work before

16   his shift, but on occasion I've seen him looking at the trucks

17   that he's about to work on before the start of the shift.

18       And the next statement he makes is the most telling

19   statement here.  He doesn't say and I go up to him and I tell

20   him, hey, you can't work and I make sure he gets paid if he's

21   doing that or I make sure he's not working.  He says my

22   assumption is that he was just using his own time to see where

23   the last shift left off.

24       That does not support their argument that there's a

25   clear prohibition here.  If their team coordinators are actively

1    policing this issue, then Mr. Peronto who saw that issue would

2    have been trained to say that's an issue I need to go make sure

3    that's not happening.

4          That did not happen here.  And that declaration for

5    Mr. Peronto supports that there just is not a prohibition and

6    that's not a clear prohibition.  And the failure to have that

7    prohibition is why a notice should go out.  They want to talk

8    about whether it's too individualized.  But they don't get the

9    benefit of the doubt here where they don't have the clear

10   prohibition.  Because while they're saying that the notice

11   process is the court lending an assist to the plaintiffs, that's

12   not the case.  The FLSA is a remedial statute.  The purpose of

13   the conditional certification process is to notify people who

14   potentially had their rights under that policy violated so that

15   they can assert a claim before their statutory periods

16   evaporate.  And that's what's happening here.

17         So this is a way that the courts have allowed a more

18   reasonable approach rather than filing a collective action and

19   saying, okay, launch into Rule 23 discovery from the outset

20   before we even figure out if this initial burden is met.

21         That is -- and that goes to the Court's question about

22   the costs, the costs of sending out notice.  You know, there's a

23   cost to the employer clearly when they have to send out a

24   notice.  And people assert legal claims against them, there's

25   always going to be a cost of defense.

1    There's also a cost to plaintiffs who don't get notice

2    and are never notified that their rights may have been violated.

3    So I don't understand why is it that the cost to the defense is

4    important here, but the cost to the potential plaintiffs and the

5    potential putative collective action members, who have never

6    been informed clearly when the compensable workday starts, when

7    they should be getting paid, why isn't it -- why isn't it that

8    the cost to them, the potential lost wages that they're not

9    going to receive, why is that not a factor?

10   They've talked about the -- they've talked about the

11   fact that there's a CBA and this is a unionized workforce,

12   that's fine, and that potentially these claims could be grieved.

13   The problem is this.  What constitutes work under the Fair Labor

14   Standards Act is a legal term of art.

15   You can't expect every -- every layperson to

16   understand, well, I guess my work started at this point.  I

17   guess it started at this point.

18   Of course, now when they're deposed the plaintiffs are

19   going to say, yeah, I think it is a violation of the CBA and

20   that I was working more than eight hours.  Because now they've

21   had the chance, they're in federal litigation against the

22   defendant and they have attorneys who are saying, hey, you know,

23   here's what potentially starts the workday under the law.

24   That's not explained in the CBA.  The CBA never says,

25   hey, you can only work your eight-hour shift.  Again, it says

28

1    you're obligated to work your assigned, your scheduled hours, it

2    doesn't say you can't work before or after them.  It doesn't

3    say, you know what, if you're coming in early and you're

4    starting to set up or you're doing pre-assembly on parts that

5    you're going to be assembling into a truck once the shift

6    starts, you need to be paid for that time.  There's nothing that

7    explains that to these employees.  So to say that they could

8    have grieved it, fine, but that assumes a base level of

9    knowledge on how the law works, that simply that -- it's not

10   there.

11           You know, the Court has -- they've discussed that this

12   is a large class of 3,000 employees over multiple locations.

13   You know, the Court addressed that and the fact that it may be

14   individualized.  The Court addressed that in the *DeKeyser v.*

15   *Thyssenkrupp* decision where it was similar, a class of 4,000

16   employees, over five or six different locations, and the Court

17   said, well, it could end up being individualized, but it's not

18   appropriate right now because the plaintiffs have met their

19   burden.  They've showed that there is a common policy or

20   practice that could violate the law.

21           And that is still what we have in this case.  And a

22   practice that allows them to come in, a failure to explicitly

23   prohibit work, that affects everyone and notice should go out to

24   everyone so we can find out who was working.  They should have

25   the right to assert their claims and find out about their

29

1   claims.

2          The defendant has argued that this is -- that these

3   pre- and post-shift periods are essentially there to provide

4   flexibility to the employees.  You know, I fail to see what

5   flexibility is allowed to the employees in allowing them to stay

6   15 minutes after the end of their shift without paying them.  To

7   the extent that they're allowed to arrive early to get to their

8   shift, fine, even if you're providing it for flexibility for the

9   employees, you still have to make sure that they're not working

10  during that time if you're not going to pay them for it.

11         And that's what they failed to do here.  So you can't

12  just say, oh, we're doing this to be good guys.  Great.  You

13  needed to go a step further here.  It's your obligation to make

14  sure that work that you don't want performed is not performed.

15  And that's the failure here.

16         They talk about having a CBA that provides, you know,

17  more robust overtime pay when people work over eight hours in a

18  day as opposed to what the FLSA requires for over 40 hours in a

19  week.  That really doesn't matter to this case.  The reality is

20  this.  If employees are scheduled to work 40 hours a week and in

21  a workweek they come in and work 15 minutes early three days and

22  work an additional 45 minutes, in that workweek, under the FLSA,

23  that employee is entitled to 45 minutes of overtime pay

24  regardless of what the CBA says.

25         This is not a claim that they violated the CBA.  This

1    is a claim that they violated our -- our plaintiffs and the

2    putative class's statutory rights under the Fair Labor Standards

3    Act.  There is no administrative exhaustion requirement, there

4    is no requirement that a plaintiff has to grieve a statutory

5    right.

6                    THE COURT:  All right.  Anything else?

7                    MR. MAYNARD:  One minute, Your Honor.

8                    They've also talked about the buzzer, that there's a

9    buzzer at the start and end of the shift.  There is a buzzer at

10   the start and end of the shift.  There was also in the *Generac*

11   decision.  But what was important in the *Generac* decision was

12   how robust the policies were and how they all worked together to

13   inform employees that you're not allowed to work.  A buzzer

14   without a clear prohibition saying, hey, you're not allowed to

15   work before the buzzer is meaningless.  It just means, okay, now

16   you've gotta be working, the buzzer is on.  It doesn't mean you

17   can't be working beforehand.  It doesn't mean you can't be

18   working afterwards.

19                   The -- you know, they talk about the CBA sets an

20   eight-hour day -- eight-hour workday as the standard workday.

21   Fine.  The CBA also explicitly says that it -- nothing in the

22   CBA should be interpreted as a guaranty or a limit on the hours

23   to be worked.

24                   Again, they've talked about average punches.  Average

25   punches don't matter.  What matters is, you know, in a

1  particular workweek when is someone punching in and when they're

2  working.  Again, someone who worked -- came in 15 minutes early

3  and worked for 15 minutes a day over a three-month period over a

4  statutory period and then came in at the start of their shift,

5  might have an average punch of two minutes before the start of

6  their shift.  That ignores the fact that for a three-month

7  period they were coming in 15 minutes early every day.

8         Defendant's also trying to shift their obligation and

9  their burden onto the union here.  Great.  This is a unionized

10 workforce.  The employer doesn't get to say we don't have to

11 follow our obligations under the FLSA because there there's a

12 union here.  I have a hard time imagining the union would have a

13 big problem if they went to them at the bargaining table and

14 said, hey, you know what, we need to have -- we are allowing

15 this 30- and 15-minute period for them to come in there, we need

16 to explicitly state in the CBA they are not allowed to work

17 during that time.

18        Similarly they say that there's never -- they talk

19 about the grievances that have been filed and that there's never

20 been any sort of -- any sort of complaint about work occurring

21 in these pre-shift and post-shift periods.  That's frankly not

22 true.

23        30(b)(6) designee Kristin Pick testified that in late

24 2018 or early 2019, at a bargaining meeting between the union

25 and the company, that the union brought up that there were a

1  group of employees that were coming in and working during this

2  time period.  They asked the union to tell them who it was and

3  the union declined to do so at that time.  And the company

4  essentially said, you know what, we're going to leave it at

5  that.  We're not going to look into it any further.

6       That is not complying with their obligations under the

7  FLSA to make sure if that work's occurring, it needs to be paid

8  or it needs to be stopped.

9       THE COURT:  Anything else?

10      MR. HAASE:  Just a couple of points, Your Honor.

11      It seems to me opposing counsel's main argument today

12  is that the company is not sufficiently monitoring what

13  employees are doing in the --

14      THE COURT:  Could you pull the microphone more to you?

15  The clerk tells me they're not picking you up as well.

16      MR. HAASE:  It seems to me their argument today is, is

17  there's not a clear prohibition on pre- or post-shift work and

18  that the defendant is not doing enough to monitor what employees

19  are doing during those pre- and post-shift periods.  There are

20  undisputed facts that contradict those contentions.  I already

21  talked about the collective bargaining agreement.  It does

22  prohibit employees from working outside their scheduled hours.

23      The company during orientation tells employees that

24  when you punch in, that's for attendance.  And the instructor

25  tells them that you shouldn't be working during those periods.

1        Team coordinators, as established by declarations and

2    admissions from the plaintiffs we were -- excuse me, as

3    established by declarations from team coordinators and

4    supervisors, those individuals are on the floor, they're

5    monitoring the employees' activities during the pre- and

6    post-shift windows, and they describe that they're not seeing

7    anyone working.

8        The fact that Mr. Peronto saw one plaintiff looking at

9    a truck is not evidence that we're not properly monitoring it.

10    The facilities are filled with trucks.  A person can't walk into

11    the facility and not look at a truck.  If you're waiting for

12    your shift to start, you're going to be looking at trucks.

13    There's no reason why Mr. Peronto should have done more

14    investigation there.

15        One thing I failed to mention earlier.  The company

16    routinely conducts floor checks where, as part of their

17    compliance program, they go and ask a random group of employees

18    a series of questions related to whether they're properly

19    recording their time.

20        One of the questions, Your Honor, is:  Have you

21    reported all of your work hours?  And another one of the

22    questions is:  Have you gotten paid for all your overtime?

23        No employee has ever answered negative to either of

24    those questions.  The company disciplines employees for working

25    outside of their shifts.  And it indicates when shifts start and

1   stop by a buzzer, which is obvious what the purpose of that is.

2           Again, these are individualized claims.  What were

3   individual plaintiffs doing and why?  Are the tasks compensable

4   work?  Was it a de minimis amount of time?  Why were they

5   engaging in the work, if at all?  Are all individualized

6   inquiries and -- both class certification -- even though we're

7   not there, but clearly conditional certification is not

8   appropriate.

9           THE COURT:  All right.  I'm not going to take it under

10  advisement.  I'm going to deny the motion for conditional

11  certification.

12          I'm satisfied that this is too close to *Generac*.  This

13  is a grace policy, it's not a rounding policy.  It does make a

14  difference.  It's clear the company has operated this as a grace

15  policy.

16          At most the evidence shows that there might be some

17  employees who have ignored their instructions from the HR and

18  others and the clear import of the union agreement and may have

19  started doing things -- although I agree, looking at a truck

20  hardly seems -- I guess you'd have to go into someone's mind to

21  know if that's some sort of pre-work intent or not.

22          But that shows the difficulty and the individualized

23  nature of each of these claims.  It depends on the individual,

24  it depends on the day, when they arrived, what they did.  Who

25  their supervisor was.  Was the supervisor -- because it's not

1    enough simply to show that somebody did something; you have to

2    show that the company acquiesced in it and allowed it to occur,

3    which implies that somebody knew about it or realized it.

4            And it seems to me the company has pretty good

5    evidence here that they tried to prevent this.  And that the way

6    it's set up, the way the time is kept, the way the whistle blows

7    or the work -- beginning work and the ending work is sound with

8    three shifts, these are the types of things that would, for the

9    most part, confine individual employees to working during their

10   shift and not after and not before.

11           That's not to say there may be some employees who have

12   avoided that somehow.  But I'm satisfied that there is not a

13   showing, the kind of showing one would expect that there's a

14   reasonable basis for believing that the -- they're similarly

15   situated to the potential class members.

16           It seems each -- any violation here would have been

17   very individualized.  It's individualized to the employee, to

18   the day, to the supervisor, to the job.

19           All of those things convince me that this case fits

20   under the *Generac* type of case where it's so specialized, it's

21   so unique that a collective action would not be a reasonable way

22   of proceeding.  So the motion for conditional certification then

23   is denied.

24           Anything else today?

25           MR. MAYNARD:  Nothing further.  Thank you, Your Honor.

1          MR. HAASE:  Thank you.

2          THE COURT:  All right.  Thank you, all.

3          (Hearing concluded at 10:51 a.m.)

4                              *     *     *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

C E R T I F I C A T E

I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.


Signed and Certified September 11, 2019.

/s/John T. Schindhelm

John T. Schindhelm


John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM

38